**C.J.(S.)R., Petitioner-Appellant,**

v.

**G.D.S. and L.S., Respondents.**

No. 13943.

Missouri Court of Appeals,
Southern District,
Division One.

Nov. 14, 1985.

**166**

Carr L. Woods, Garrett & Woods, Monett, for petitioner-appellant.

No appearance for respondents.

PER CURIAM.

C.S.R. (mother) and G.D.S. (father) were married in Jasper County, Missouri. Two children were born of the marriage, a daughter in 1973, and a son born in 1975. The marriage of the parties was dissolved on June 25, 1979, in Barry County, Missouri, where G.D.S. was residing. The mother did not contest the action, and the father obtained judgment by default, including custody of the two children. The father remarried and is now living in Springdale, Arkansas. The mother remarried and lives in Graham, Texas.

On December 22, 1983, after being advised that the children were being abused while in the custody of their father, the mother filed a motion to modify the dissolution decree seeking custody of the children, and joined L.S., the paternal grandmother, as a party. The motion was filed in Barry County, where the children were living at that time with L.S. The mother's motion alleged the following change of circumstances since the dissolution of marriage:

1) She has remarried and is able to provide a suitable home environment for the children.

2) The father has denied visitation rights to the mother.

3) The children are not living with the father, but are living with their paternal grandmother.

4) The father has mentally and verbally abused the children which resulted in their removal from his home and placement in the home of their grandmother.

The record does not indicate that an answer denying these allegations was ever filed by either the father or grandmother. While the legal effect of such failure to answer is to admit the allegations, Rule 55.09,[1] such failure was waived by the mother's proceeding to a hearing on the merits without objecting to the fact that there was no denial of her allegations. *Blaise v. Ratliff,* 672 S.W.2d 683, 688 (Mo. App.1984).

A hearing was held on the motion on May 16, 1984. After hearing testimony, the trial court took the question of modifying custody of the children under advisement, pending receipt of a home study report on the mother's home in Texas. On August 28, 1984, the trial court, after considering the testimony and reports filed by the Texas Department of Human Resources and the Arkansas Department of Human Services, entered judgment granting the mother specific visitation during the summer months and during the Christmas holidays, but denied her request for custody, stating that no material facts had been shown which resulted in a change of circumstances justifying modification of the custody provisions of the dissolution decree. The net effect of this judgment was to leave custody of the children in the father.

The mother appeals, contending that the trial court's finding that no material facts had arisen since the date of the decree granting custody of the children to the father that constituted a substantial change of circumstances justifying modifying the custody provisions of the decree was not supported by substantial evidence, was against the greater weight of the evidence, and constituted an abuse of the trial court's discretion. The father has not favored us with a brief supporting the judgment of the trial court.

In our review, we are mindful that we should not set aside a trial court judgment on the ground that it is against the

---

1. Unless otherwise indicated, all references to rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1978, V.A.M.S.

greater weight of the evidence unless we have a firm belief that the judgment is wrong. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). We also give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Rule 73.01(c)(2).

The evidence before the trial court was as follows. The third grade teacher (1982–83) of the little girl testified that in 1983, the child was "very thin and her eyes were just black circles—black circles around her eyes," she cried "at least three or four times a week," did not play with other children during recess but wanted to stay inside and talk with her, and had bruises and belt marks on the middle of her back and sores on her scalp. In September of 1983, at the beginning of the school term after summer vacation, the little girl had lost five pounds. During the two months she was with her paternal grandmother, she gained ten pounds. During that following school year (1983–84), the little girl still came to her at least once a week complaining of her home conditions.

The little girl's fourth grade teacher (1983–84) said the little girl "cried a lot," said her hands hurt (they were red), she had bruises on her body, and her "eyes were sunken in and kind of purple and she had kind of a haggard look." She also testified the child was very thin. Both teachers reported the suspected child abuse to the school authorities.

The school counselor counseled both children in 1982 and 1983. The children had bruises and belt marks on their bodies. On August 30, 1983, Scott had five bruises 1" to 2" long on his right leg between his hip and knee. The little girl sustained a five pound weight loss (down to 48 pounds for an eight-year-old child) during the summer vacation. The children complained of their home situation, and said they were not getting warmth and affection at home. The children also said they were forced to stand in one place (in their living room) for long periods of time, were locked in their bedrooms, and were sent to bed without supper as punishment. The little girl felt unloved because of her mistreatment at home.

The school principal referred the matter to SCAN in September of 1982, a contract agency for the Arkansas Department of Social Services. SCAN is an organization that provides counseling services to parents where abuse of a child under 12 years of age is suspected.

The director of SCAN in Washington County, Arkansas, after receiving the child abuse report from the children's school, interviewed the father and stepmother at the children's school on March 20, 1983. The father admitted 1) locking the children in their rooms at night, 2) making them stand in the middle of the room as punishment, and 3) making the children wash their soiled underwear in the toilet. The father and stepmother refused counseling and said they "didn't want anyone visiting in their home and telling them how to raise the children." The director then referred the case to the Arkansas Department of Social Services for protective services because of the refusal of the father and stepmother to cooperate with the agency. The principal of the school also urged the father to accept help from SCAN, but the father refused.

In September of 1983, a social worker from the Arkansas Department of Social Services received a complaint from the school. A worker was sent to the Smith home and took pictures. In her testimony, she reiterated the examples of child abuse heretofore mentioned, said that a dirty sock had been stuffed in the little girl's mouth to keep her from "whining" and that the pillows from the children's beds had been removed a year ago and not returned, after the children had engaged in a pillow fight. She also testified that the father refused counseling and that the stepmother would not talk to the social workers, supposedly on the advice of counsel. The little boy had begged food from the cafeteria workers. The children said they were not allowed to watch television, have any snacks, or see friends. They were allowed to change underwear every three days, and

had to wash their soiled underwear in the toilet.

The children's mother testified that she had married C.R., a disabled veteran, after her marriage to G.S. was dissolved, and has a four-year-old son by her second marriage. She lives in a three bedroom, two bath home, which is suitable for the two children in question, and has ample funds to care for them. She admitted that she had only seen the children twice since the dissolution of marriage, and had not talked to them on the telephone. She explained this by saying the children's father would not let her visit the children or talk to them on the phone. She said he also told her that if she sent presents to the children, they would be thrown in the trash. Her present husband, C.R., testified he wanted the children and could support them.

The father, a service manager of an automobile shop, remarried in the spring of 1980. His present wife works from 6 a.m. to 2:30 p.m. outside the home. The home is adequate for the children's care. He said the mother had only tried to see the children twice and called twice since the marriage was dissolved. He admitted locking the children in their rooms at night, taking their pillows away "for a few days," making them wash soiled underwear in the toilet stool, using a belt to whip the little boy, that his wife had stuffed a sock in the little girl's mouth as punishment, and that the children were forced to stand in one place for "a half hour" as punishment. He admitted that he had refused counseling concerning the child abuse complaint, but stated that he and his wife, accompanied by the children, had seen a private psychiatrist on two occasions.

The children's paternal grandmother testified that the children had stayed with her from October 25, 1983 until January 4, 1984, and that the children did not appear to be having any problems.

The stepmother admitted that she and her husband had refused counseling, and that the psychiatrist had "suggested a few things" to them regarding treatment of the children.

A neighbor testified that the children were well cared for, and that the father and stepmother showed love and affection toward the children.

The little girl was interviewed in chambers by the trial judge. She stated she had been whipped with a belt, cried a lot at school, was locked in her room at night, had to wash underclothes in the toilet, and had a sock stuffed in her mouth to stop her from crying.

The home study report of the mother's home in Texas was favorable and stated that the mother and her present husband have a stable home environment and ample resources to care for the children, and would provide a positive and supportive environment for them.

The current status report of the Department of Social Services of the state of Arkansas, filed after the children had returned from a visit with their mother in Texas, consisted of inquiries of the children in the presence of their stepmother. Both children appeared apprehensive and looked at their stepmother before they answered any questions. The only time either child showed any animation was when they talked about visiting with their mother in Texas.

In its memorandum opinion supporting the judgment, the trial court concluded that although the mother's home was adequate to care for the children's needs, the fact that she had contributed nothing to their financial support for four years, and had not seen them during that period, indicated that she was indifferent to their welfare. The trial court also found that the children had been mistreated while in their father's custody, and that punishment imposed on the children by their father and stepmother was "inappropriate and excessive and cannot be condoned by this court and do [sic] evidence a lack of parenting skills." The trial court, evidently feeling that abuse of the children by their father and his new wife was preferable to past neglect of them by their mother, found that the child abuse

was not a sufficient change in conditions to merit a change in their custody.

■ Our review convinces us that the judgment emanating from this finding is not supported by substantial evidence, and is against the weight of the evidence. While the judgment must be reversed for that reason, we are not convinced, on the basis of the record, that the mother should prevail on her motion for custody, and have no way of knowing whether the father and stepmother, some seventeen months after the custody hearing, have sufficiently rehabilitated themselves so as to be fit parents for children of tender years.

■ In pursuit of the answer to the question as to who should have custody of the children, we note that it is the public policy of our state that, in cases where the welfare of a child is involved, the child becomes a ward of the court with respect to the issues of that case, *State ex rel. Catholic Charities of St. Louis v. Hoester*, 494 S.W.2d 70, 73 (Mo. banc 1973), and that in such cases, the overriding duty of the court is to serve the best interest of the child. *McCammon v. McCammon*, 680 S.W.2d 196, 202 (Mo.App.1984). In approaching that task, the trial court is not limited to sifting out competing claims by warring parents, but can, and should, see that all available evidence concerning the child custody issue is produced in court so that it can be thoroughly evaluated before a decision on the custody issue is reached. In most custody cases, the evidence gatherers are the lawyers for the competing parents, whose primary purpose is to put their client's best foot forward, at the expense of the other parent. As a result, no one is really representing the interests of the children.

Legislative attention has been given to this problem through the enactment of § 452.490.4,[2] which reads as follows:

> 4. If the court finds it to be in the best interest of the child that a guardian ad litem be appointed, the court may appoint a guardian ad litem for the child. The guardian ad litem so appointed shall be an attorney licensed to practice law in the state of Missouri. The guardian ad litem may, for the purpose of determining custody of the child only, participate in the proceedings as if he were a party. The court shall allow a reasonable fee to the guardian ad litem to be taxed as costs in the proceeding.

This section gives the trial judge discretionary authority to appoint a guardian ad litem for the child in custody proceedings, but does not mandate that he do so. While the legislature has provided in § 210.160 [3] for the mandatory appointment of a guardian ad litem to represent abused or neglected children, in cases where such children are the subject of proceedings under §§ 210.110 to 210.165, 210.700 to 210.760, 211.442 to 211.492, and 453.010 to 453.170, those sections refer to procedures to take abused or neglected children in protective custody, court review of cases involving placement of children with state agencies, such as the Division of Family Services or foster homes, termination of parental rights, and adoption cases, but there is no mandate for such an appointment in child custody cases even where, as here, child abuse on the part of a custodial parent is alleged. We consider this omission a legislative oversight which we sincerely hope will be rectified in the near future.

■ In the interim, we hold that it is an abuse of discretion not to appoint a guardian ad litem, as permitted by § 452.490.4, where, as here, the choice of the custodian of minor children is in issue, and the court has knowledge, from the pleadings or from any other source, that the children in question have been, or are being, abused while in the custody of one claiming the right to be their custodian. This holding applies to this case.

Children are our most precious resource, and it is fundamental that they have a chance to be brought up in an environment where they are not abused or neglected.

---

2. RSMo Supp.1984.

3. RSMo Supp.1984.

To that end, it is the duty of our courts to use every available legal means to see that such a goal be attained.[4]

The judgment of the trial court is reversed, and the cause is remanded for appointment of a guardian ad litem, and after appropriate pleadings are filed, to hear additional testimony and thereafter determine custody, after consideration of all relevant factors, including those listed in § 452.375.

All concur, except FLANIGAN, J., concurred in result only and filed opinion.

FLANIGAN, Judge (concurring in result.)

I concur in the result. The instant record demonstrates that the trial court should have appointed a guardian ad litem for the two children and abused its discretion by not doing so. I do not agree that the mere pleading of child abuse requires a trial court to appoint a guardian ad litem in all cases of this nature. I do not feel that there is "a legislative oversight" in § 452.-490.4. Whether that statute should be amended is a legislative matter.

**4.** For an excellent discussion on the rights of children in custody proceedings, *see* Speca, *Representation of Children in Custody Disputes: Its Time Has Come,* 48 U.M.K.C.L.Rev. 328 (1980).